UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


BRAD VAMPLEW,

      Plaintiff,

vs.                                          Case No. 12-14561

WAYNE STATE UNIVERSITY BOARD         HON. AVERN COHN
OF GOVERNORS, DAVID J. STRAUSS,
Dean of Students, individually and in his
official capacity, BARBARA K. REDMAN,
Dean of Wayne State College of Nursing,
individually and in her official capacity,
CYNTHIA REDWINE, Assistant Dean of
Student Affairs, individually and in her
official capacity, FELICIA GRACE, Academic
Services Officer IV, individually and in her
official capacity, MARY ZUGCIC, individually
and in her official capacity, and KATHERINE
ZIMNICKI, individually and in her official capacity,

      Defendants.

_____/

## MEMORANDUM AND ORDER
## GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Doc. 66)

### I.  Introduction

This is a case challenging an academic dismissal.  Brad Vamplew (Vamplew) is

suing the Wayne State University Board of Governors and several faculty members of

the Wayne State University College of Nursing.  Vamplew allegedly engaged in an

"unsafe practice" during a clinical rotation in the course NUR 3020, taught by defendant

Mary Zugcic.  As a result, Vamplew failed the course and under the College of Nursing's

policy, a failure for an unsafe practice results in exclusion from the nursing program.

Vamplew appealed the decision within the College of Nursing and the Provost's office; his appeals were denied.  Vamplew then filed this action in federal court challenging his termination from the program.  As will be explained, the amended complaint asserts thirteen claims.  Following discovery, Vamplew agreed to dismiss all claims except disability retaliation under state and federal law against WSU and violation of due process and equal protection under state and federal law against all defendants.

Before the Court is defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6) or for summary judgment under Fed. R. Civ. P. 56.  For the reasons that follow, the motion is GRANTED.  Some of Vamplew's claims fail to state a plausible claim and other claims fail because there is no genuine issue of material fact to allow his claims to proceed.

## II.  Background

### A.  The Complaint

On November 9, 2012, Vamplew filed a thirteen count amended complaint against the following defendants:

Board of Governors of Wayne State University (Wayne State)

David J. Strauss, Dean of Students, individually and in his official capacity

Barbara K. Redman, Dean of Wayne State College of Nursing, individually and in her official capacity

Cynthia Redwine, Assistant Dean of Student Affairs, individually and in her official capacity

Felicia Grace, Academic Services Officer IV, individually and in her official capacity

Mary Zugcic, individually and in her official capacity

Katherine Zimnicki, individually and in her official capacity

The amended complaint asserts the following claims:

| | |
|---|---|
| Count I | Discrimination under the Americans With Disabilities Act (ADA) |
| Count II | Discrimination under Michigan's Rehabilitation Act |
| Count III | Discrimination under Michigan's Persons with Disabilities Civil Rights Act (PWDCRA) |
| Count IV | Retaliation in violation of the ADA |
| Count V | Retaliation in violation of the Rehabilitation Act |
| Count VI | Retaliation in violation of the PWDCRA |
| Count VII | Violation of 42 U.S.C. § 1983 - due process |
| Count VIII | Violation of 42 U.S.C. § 1983 - equal protection |
| Count IX | Violation of Michigan Constitution - due process |
| Count X | Violation of Michigan Constitution - equal protection |
| Count XI | Breach of Contract or Implied Contract |
| Count XII | Intentional Infliction of Emotional Distress |
| Count XIII | Tortious Interference with a Contract or Advantageous Business Relationship or Expectancy |

After the conclusion of discovery, Vamplew agreed to voluntarily dismiss the disability discrimination claims, (Counts I, II and III) and the state common law claims (Counts XI, XII and XIII).  He has also dismissed any claim against defendant Katherine Zimnicki in her "official capacity."  See Doc. 65.  Accordingly, the remaining claims are for disability retaliation under state and federal law against Wayne State (Counts IV, V and VI), and for violation of due process and equal protection under state and federal law against all defendants (Counts VII, VIII, IX and X).

3

As relief, Vamplew seeks damages and an order "enjoining defendants from ever alleging that he engaged in conduct that warranted being excluded from the nursing program ... and being banned from Wayne State University campus" and enjoining defendants "from further acts of wrongdoing."

## B.  Facts

The material facts as gleaned from the parties' papers follow.[1]

### 1.  The Parties

Vamplew is a former student in Wayne State's College of Nursing.  The relevant events occurred in the Winter Term 2012 when Vamplew was a Junior.  At the time, Vamplew had a GPA of 3.94.  In the prior semester, Vamplew had been diagnosed with Attention Deficient Hyperactivity Disorder Combined Type.  As a result, Vamplew received accommodations including additional test time, being able to use an audio recorder and obtain copies of all power points used in the classroom.

Wayne State University is a constitutionally created, public State University. Mary Zugcic is a Clinical Instructor at Wayne State and was Vamplew's instructor in NUR 3020, Winter Term 2012.  She made the decision to fail him for having engaged in an unsafe patient practice.  That failure resulted in his exclusion from the nursing program.  Katherine Zimnicki was also a Clinical Instructor.  She taught Vamplew in NUR 3010, a class he took and passed the semester prior to his failure.  Felicia Grace is an "Academic Services Officer IV."  She was also the liaison from the Office of

---

[1]Defendants complied with the Court's motion practice guidelines for a motion for summary judgment.  Vamplew did not.  Although Vamplew submitted separate statements of material facts, he did not tab or highlight the exhibits.  The failure to tab and highlight the exhibits made it difficult to work through his filings.

Student Affairs (OSA) within the College of Nursing to the Student Disabilities Services. Prior to her retirement Cynthia Redwine was the Assistant Dean in the Office of Student Affairs in the College of Nursing.  David Strauss is the Dean of Students and in the Winter Term 2012, he was Chair of the S.U.I.T.[2] committee that deals with issues involving students and potential violence or threatening behavior.  Barbara Redman is the former Dean of the College of Nursing.  After this lawsuit was filed, she resigned from Wayne State and accepted a position with an out-of-state institution.

### 2.  The Incident

In the Winter Term 2012, Vamplew was a student in NUR 3020, a class taught by Zugcic.  NUR 3020 has a classroom and clinical component.  Zugcic was the Course Coordinator for NUR 3020 and the clinical instructor for the clinical portion of the course. In order to pass NUR 3020, a student must pass both the classroom portion and the clinical portion of the course.  A failing grade in the clinical portion results in failure of the course.  Passing the clinical portion of the course requires the student to pass the identified critical behavior in the Course Syllabus, which includes "provides safe physical care for patients with chronic illness."  Importantly, a student can be excluded from the College of Nursing for an unsafe practice without having been previously warned. "Exclusion," as defined in the handbook, means that the student may not register in the program, which effectively results in being dismissed from the program.

On April 5, 2012, Vamplew's clinical group for NUR 3020 was assigned to the Rehabilitation Institute of Michigan (RIM), a DMC facility.  Vamplew was assigned that

---

[2]S.U.I.T. stands for the Student Update Information Team.

5

day to "Patient G."  Patient G was admitted to RIM with a traumatic brain injury.  In addition to the traumatic brain injury, Patient G was post-surgery for a repair to a leg fracture.  On April 5, 2012, he was taking prescribed morphine.  He was using a full leg "knee immobilizer" which went all the way up his leg and prevented him from bending his knee.  He used a wheelchair to ambulate.  He was anemic.  Patient G's medical records indicate that: He was on non-weight bearing restrictions and that he required reminders to comply with his non-weight bearing restrictions.  Patient G also had reported a history of mental illness, including a diagnosis of schizophrenia.  He was a multiple drug abuser and the initial admission to the hospital for the injuries that brought him to RIM he tested positive for heroin, crack, marijuana and alcohol).  He also had impaired cognition, was at risk for falls, and was impulsive.  Patient G also had safety awareness issues, and needed reminders of some of the precautions in place such as the non-weight bearing restrictions.  Patient G might be prone to engage in an activity which was contrary to his restrictions, and a trained individual needed to remind him of those precautions.

On April 12, 2012, RIM Physical Therapist Katie May McSween (McSween) approached Zugcic and told her that she had a concern with one of the students. McSween told Zugcic that on April 5, 2012, the student, Vamplew, had left the unit with Patient G and went with him to the vehicle in the lobby which was used to practice entering and exiting a vehicle.  This was the first time that Zugcic was made aware of any issues regarding Vamplew's interactions with Patient G on April 5.

McSween said she reported the matter because she felt it was an "alarming" "patient safety issue" that needed to be reported.  McSween said she was concerned

6

because Vamplew had not been trained in assisting patients into or out of a vehicle. McSween further said that she discussed the matter with some of the professional RIM team members, and they were "appalled" because they also thought it was a serious safety issue.  McSween testified at deposition that Patient G had not previously performed a car transfer independently, or demonstrated that he could do so independently and safely.  However, McSween also testified at deposition that she thought it would be a "learning experience" for Vamplew, implying at least her belief that Vamplew would continue as a student in the nursing program.

McSween and Zugcic met with Vamplew later on April 12, 2012.  Both McSween or to Zugcic testified that it did not appear to them that Vamplew understood that what he did was a patient safety issue or its seriousness.

Zugcic met alone with Vamplew after McSween left the room.  Zugcic tod Vamplew that the matter was serious and that he should write a statement of what had occurred.  She also told Vamplew to discontinue any further patient care and leave RIM. Zugcic later sent Vamplew an e-mail indicating that he was to have no further contact with the DMC or RIM.

Vamplew called McSween later that day.  He told her that he might get "kicked out" of the nursing program for what had occurred.

That same day, Vamplew gave Zugcic a handwritten statement.  Zugcic gave the statement back without reviewing it and told Vamplew he should take his time and submit a more formal statement.  From the handwritten statement and Vamplew's deposition, the following can be gleaned.  Patient G told Vamplew that he was going to leave the unit and go in the "demo car."  At the time, Patient G was in bed and using the

full leg knee immobilizer.  Patient G told Vamplew he had signed himself out and was going to be discharged that day.  Vamplew told him that was not a good idea but Patient G got out of bed himself and into a wheelchair.  Vamplew tried to find his nurse but was not able to do so.  Vamplew did not use the call button by Patient G's bed to call for assistance.  Rather, he decided to go with Patient G and took the elevator to the lobby.  There were people present on the unit, including persons Vamplew believes RIM staff, but Vamplew did not ask any of them for assistance.  When Vamplew and Patient G arrived at the lobby, there were security guards nearby but Vamplew did not ask any of the security guards for assistance or to notify any of the RIM staff or Zugcic.  Vamplew assisted Patient G in the patient getting in and out of the vehicle.  Vamplew opened the vehicle door, held Patient G's hand(s) behind his head as Patient G entered the vehicle.  Vamplew also got into the vehicle with Patient G.  After leaving the car, Patient G, accompanied by Vamplew went outside.  There were additional security guards near the door from which they exited, but Vamplew did not ask any of the guards for assistance.  Patient G and Vamplew later came back into the facility and returned to the unit.

At deposition, Vamplew admitted that neither the physical therapist (McSween) nor Patient G told him that Patient G had been given any instruction in getting into or out of a vehicle.  Vamplew also stated that no one ever showed him or gave him any instruction in how to assist a patient to get from a wheelchair into a vehicle.  He also testified that as of April 5, 2012, he did not feel he had the skills to assist a patient from a wheelchair into a vehicle.

Vamplew did not report the incident to Zugcic that day.  However, Vamplew says

8

that Patient G wrote in the "log" that he was leaving the unit with Vamplew to go to the lobby, and that this constituted sufficient communication.  Vamplew also says that the reason he did not report to Zugcic that he and Patient G had left the unit and go to the practice vehicle was because "it really didn't seem very significant" and he didn't "think it was that big of a deal."  "[I]t didn't really seem to me at that time like it was a big deal."  "And the patient leaving the unit, I didn't feel it was a big situation at that time for him to leave the unit and off privileges or something.  I thought the point of rehab was to promote activity."

Vamplew later prepared an "SBAR"[3] report for April 5, 2012.  The SBAR was a regular requirement of the clinical portion of the course.  The purpose of the SBAR is for the student to transmit the pertinent information regarding the patient to the nurse who will assume care in the next shift.  Vamplew submitted the SBAR to Mary Zugcic prior to his meeting with her on April 12.  The SBAR makes no mention of Patient G or Vamplew leaving the unit or using the practice vehicle.

On April 13, 2012, Vamplew submitted a second statement, typewritten and titled "Incident Report for NUR 3020."  In this statement, Vamplew says that he made a "thoughtful decision" to follow Patient G "to try to ensure his safety."  Vamplew further said

> As pointed out by my instructor and the physical therapist, I fell short of providing my patient with safe physical care.  I take full responsibility for my actions and regret this error in judgment.  I also take full responsibility to learn from my mistakes and intend for this to never happen again.

---

[3]SBAR (Situation-Background-Assessment-Recommendation) is a communication technique used in the health care industry.

9

Zugcic eventually decided to fail Vamplew in NUR 3020 for failing to meet critical course objectives of failing him for an unsafe patient practice.  Zugcic concluded that the matter constituted an unsafe patient practice, sufficiently serious that she decided it warranted failing the clinical portion of the class which resulted in a failure of the class itself.  Zugcic testified at her deposition that it was her professional judgment that Vamplew exercised poor judgment and that there was no reason to believe that he had the insight or ability to apply his assessment in a safe manner, and saw no indication that Vamplew understood the significance of the incident or took full responsibility for what had occurred, despite his written statement to the contrary.

Zugcic met with Vamplew on April 17 to inform him of her decision.  Vamplew recorded the meeting; Zugcic did not know this.  Zugcic asked Katherine Zimnicki to attend the meeting as a witness.  Zugcic explained to Vamplew that she had spent the whole weekend considering her decision and did not come to the decision to fail him for an unsafe practice lightly.  Zugcic also told Vamplew to speak with the Student Affairs Office and they would tell him about an appeal process.  Zugcic also told Vamplew that she did not ban him from DMC, and did not have the power to do that, and that if he wanted to go to DMC or contact them he could but that she understood that security would be notified and she wanted to make him aware of that.

During the April 17 meeting, Vamplew stated that he did not believe his actions constituted an unsafe patient practice.  Vamplew explained that Patient G was making his own decision, he had the right to leave the unit and he signed himself out independently.  Vamplew explained that because Patient G had signed himself out, his responsibility was terminated and he was just a follower.

10

On April 19, Vamplew was given documents for an appeal.  Vamplew submitted an appeal statement to the College of Nursing that same day.  In this statement, Vamplew says:  "[I] verbally tried to stop my patient from leaving the unit and he exercised his right to sign off the unit.  The patient signed himself off the unit independently.  His cognition was fully intact . . .  The patient previously left the unit the day before by signing himself out and leaving on his own.  As a student nurse I realized it would be best to ensure patient safety by following him." "I didn't sign or attest to the report when I met with Zugcic on Tuesday.  Therefore this submission in a legal aspect is null and void."

Vamplew's appeal was considered by Janet Harden, then Interim Assistant Dean of Adult Health, College of Nursing and Jean Davis, then Associate Dean of Academic and Clinical Affairs, College of Nursing.  After reviewing the documents, including Vamplew's statement, Dr. Harden and Dr. Davis upheld Zugcic's decision to fail him for an unsafe patient practice.  Vamplew was notified of the decision.

Under Wayne State's policy, Vamplew could appeal to the office of the Provost Vamplew did that.  Amy Cooper, the Administrative Assistant in the Provost's Office told Vamplew she "would take whatever he wanted to submit."  Vamplew submitted documents in addition to those he had provided in his first appeal within the College of Nursing.  His appeal was reviewed by Dr. Harold Shapiro, the Provost's designee.  After consideration Dr. Shapiro denied the appeal and informed Vamplew in a latter dated May 9, 2012.

Prior to Dr. Shapiro's decision, on May 4, 2012, Vamplew came to the Provost's Office in person to submit some additional documents as part of his appeal.  He

11

provided those documents to Cooper.  Cooper testified at deposition that while there

Vamplew made statements that she felt were threatening.  She stated that Vamplew

told her he was on medication for stress and panic attacks, that he was "about to snap"

and that "if I have to come back, you will not be happy."  After Vamplew left, Cooper

sent an e-mail to David Strauss in his capacity as Chair of the S.U.I.T Committee.

Following Cooper's report, Strauss issued a "cease and desist" letter to Vamplew,

instructing him that he should have no further contact with the College of Nursing or with

the Provost's Office.  Strauss testified that the cease and desist letter was unrelated to

the substantive issue of whether or not Vamplew's appeal to the Provost would be

granted.  Strauss also testified that he had no role in the academic decision as to

whether or not Vamplew would be allowed to continue as a student.  Strauss also

testified that Dr. Shapiro did not ask him his opinion or request any information

regarding that academic decision, nor did Strauss offer any.

Sometime in May 2012, Vamplew met with the Coordinator for Eastern Michigan

University's (EMU) College of Nursing.  He recorded that meeting.  In that meeting,

Vamplew admitted that in making her decision Zugcic was exercising her clinical

judgment: "I never made any sort of other mistakes and it wasn't like consistent unsafe

behavior, but I guess that's her clinical judgment."  The EMU Nursing Coordinator

apparently told Vamplew that his failure to document what had occurred was "clearly an

issue of patient safety", and that she understands why the decision to fail him was not

reversed.

### III.  Legal Standards

Defendants have moved to dismiss under Fed. R. Civ. P 12(b) and for summary

12

judgment under Fed. R. Civ. P. 56.  A motion to dismiss pursuant to Federal Rule of

Civil Procedure 12(b)(6) tests the sufficiency of a complaint.  To survive a Rule 12(b)(6)

motion to dismiss, the complaint's "factual allegations must be enough to raise a right to

relief above the speculative level on the assumption that all of the allegations in the

complaint are true."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal

citations and emphasis omitted).  See also Ass'n of Cleveland Fire Fighters v. City of

Cleveland, Ohio, 502 F.3d 545, 548 (6th Cir. 2007).  "[T]hat a court must accept as true

all of the allegations contained in a complaint is inapplicable to legal conclusions.

Threadbare recitals of all the elements of a cause of action, supported by mere

conclusory statements do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)  The

court is "not bound to accept as true a legal conclusion couched as a factual allegation."

Id. at 679 (internal quotation marks and citation omitted).

   "The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A moving party may meet that burden "by

'showing' – that is, pointing out to the district court -- that there is an absence of

evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S.

317, 325 (1986).  Revised Rule 56 expressly provides that:

> A party asserting that a fact cannot be or is genuinely disputed must
> support the assertion by:
>
> (A) citing to particular parts of materials in the record, including
> depositions, documents, electronically stored information, affidavits or
> declarations, stipulations (including those made for purposes of the motion
> only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or

presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).  The revised Rule also provides the consequences of failing to properly support or address a fact:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
>
> (1) give an opportunity to properly support or address the fact;
>
> (2) consider the fact undisputed for purposes of the motion;
>
> (3) grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it; or
> (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).

When the moving party has met its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact, id. at 587, drawing "all justifiable inferences in the light most favorable to the non-moving party," Hager v. Pike County Bd. Of Education, 286 F.3d 366, 370 (6th Cir. 2002).

## IV.  Analysis

### A.  Section 1983 Claims

#### 1.  Immunity - Money Damages/Official Capacity

14

Defendants contend Vamplew's § 1983 claims against Wayne Stat and the individual defendants in their official capacities claiming a violation of due process and equal protection (Counts VII and VIII) and seeking money damages must be dismissed because they are barred by the Eleventh Amendment. The Court agrees.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend XI. Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, if the state has not waived immunity and Congress has not expressly abrogated Eleventh Amendment immunity by statute. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 98–101 (1984); Alabama v. Pugh, 438 U.S. 781, 782 (1978); Missouri v. Fiske, 290 U.S. 18, 27 (1933) ("[e]xpressly applying to suits in equity as well as at law, the Amendment necessarily embraces demands for the enforcement of equitable rights and the prosecution of equitable remedies when these are asserted and prosecuted by an individual against a State"); O'Hara v. Wigginton, 24 F.3d 823, 826 (6th Cir.1993).

Wayne State is a state institution of higher education. It is a state entity which the state legislature supports through appropriations. See Mich. Const. Art. 8, § 4 ("The legislature shall appropriate moneys to maintain the University of Michigan, Michigan State University, Wayne State University, Eastern Michigan University, Michigan College of Science and Technology, Central Michigan University, Northern Michigan

University, Western Michigan University, Ferris Institute, Grand Valley State College, by whatever names such institutions may hereafter be known, and other institutions of higher education established by law").  As a state institution of higher education, Wayne State is entitled to Eleventh Amendment immunity.  See, e.g., Hill v. Board of Trustees of Michigan State University, 182 F. Supp. 2d 621, 625 (W.D. Mich. 2001) (holding the Michigan State University, which the state legislature supports through appropriations under Mich. Const. Art. 8, § 4, is an arm of the state and immune from suit under the Eleventh Amendment, "whether th action is for damages or injunctive relief"); Javetz v. Board of Control, Grand Valley State University, 903 F. Supp. 1181, 1186 (W.D. Mich.1995) (noting that the plaintiff acknowledged that GVSU was an arm or instrumentality of the State of Michigan and that the Eleventh Amendment bars suit against it under 42 U.S.C. § 1983); An"Ti Chai v. Michigan Technological University, 493 F. Supp. 1137, 1163–64 (W.D. Mich. 1980) (concluding that Michigan Technological University "is an agent of the State empowered under the Eleventh Amendment to invoke sovereign immunity").  Rainey v. Wayne State University, 26 F. Supp. 2d 973 (E.D. Mich. 1998) (Wayne State entitled to immunity in a patent suit); Tran v. Wayne State University, 1996 U.S. Dist. LEXIS 5528 (E.D. Mich, No. 95-CV-72662) (dismissing a third year medical student's § 1983 claims on the grounds of Eleventh Amendment).

The same is true as to the individual defendants sued in their official capacities. It is well established that a claim for monetary damages against a state employee in his or her official capacity is barred by Eleventh Amendment immunity.  See Will v.

<u>Department of State Police</u>, 491 U.S. 58 (1989); <u>Rodgers v. Banks</u>, 344 F.3d 587, 594 (6th Cir.2003) ("the Eleventh Amendment bars § 1983 suits seeking money damages against states and against state employees sued in their official capacities").

Vamplew does not contest these holdings but still argues that Wayne State is not an arm of the state and therefore the Eleventh Amendment does not apply.  This argument is unavailing.  The cases upon which Vamplew relies did not involve entities – such as Wayne State – which were created under state constitutions and are otherwise distinguishable.  In <u>Kovats v. Rutgers</u>, 822 F.2d 1303 (3rd Cir. 1987), the conclusion that Eleventh Amendment immunity did not apply was based on several factors not present here. First, the court noted that "Rutgers was originally a private institution."  It became a state university through a legislative enactment, not – as with Wayne State– through a constitutional mandate.  Moreover, the court noted that "in the statute governing Rutgers, New Jersey has twice explicitly insulated itself from any liability on obligations running against Rutgers."  Here, by contrast there is a state statute requiring a judgment against a corporate body or board of a state institution be included and collected in the state tax.  Mich. Comp. Law § 600.6095.

In <u>Soni v. University of Tennessee</u>, 513 F.2d 347 (6th Cir. 1975), the court did not address the Eleventh Amendment immunity issue.  Rather, it found that <u>even if</u> there was immunity the State of Tennessee had waived it by providing in the University's charter that it could be sued "in any court of law or equity in this State or elsewhere."  Vamplew has not argued waiver.

In short, Wayne State and the individuals in their official capacities are entitled to

dismissal of Vamplew's § 1983 claims for money damages on the grounds of Eleventh Amendment immunity.

### 2.  State Actors

Defendants also argue that dismissal is appropriate as to the individual defendants because they are not "persons" within the meaning of § 1983.  Section 1983 provides that "Every person who, under color of any statute …subjects, or causes to be subjected, any citizen of the United States… to the depravation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured…" (emphasis added).  It is Vamplew's burden to establish that "the conduct complained of was committed by a person acting under color of state law…"  Graham v. Nat'l Collegiate Athletic Assoc., 804 F.2d 953, 957 (6th Cir. 1986).  In Will, 491 U.S. at 64, the Supreme Court explicitly found "that a state is not a person within the meaning of § 1983."  As an instrumentality of the State it is well accepted that a public university, such as Wayne State, is not a "person" under § 1983.  See, e.g., Underfer v. Univ. of Toledo, 36 F. App'x 831 (6th Cir. 2002), citing Hall v. Medical College of Ohio at Toledo, 742 F.2d 299, 304 (6th Cir. 1984); Cowan v. Univ. of Louisville School of Med., 900 F.2d 936 (6th Cir. 1990).  The same is true as to Vamplew's claims against the individual defendants in their official capacities.  See Will, 491 U.S. at 71 (stating that "neither a State nor its officials acting in their official capacities are 'persons'" for purposes of a §1983 claim).

Vamplew has not addressed this argument in his response.  In any event, the Court agrees that Wayne State and the individual defendants in their "official capacity"

18

are entitled to dismissal of Counts VII and VIII on this ground.

Defendants further argue that the individual defendants Zugcic, Zimnicki and Grace[4] are not "state officials" who can be sued even in their individual capacity. A constitutional claim against an individual can only be maintained if the individual is a State "official." Will, 491 U.S. at 71. That is true whether the claim seeks liability in an "official" or individual capacity. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Chappell v. Cleveland, 585 F.3d 901, 907 (6th Cir. 2009). Defendants contend that Zugcic, Zimnicki and Grace are not state "officials." Grace is an "Academic Services Officer IV" and at all relevant times Zugcic and Zimnicki were clinical instructors. None of them were officers or even high level administrators of the University. None had authority to set policy either within the College of Nursing or Wayne State. None supervised other employees. None had the independent authority to hire, fire or discipline employees. Vamplew does not dispute these facts. Vamplew does not address this argument in his response. At best, Vamplew only mentions Zugcic, contending that she is individually liable because she had "unfettered discretion" in making the decision to fail him. This is not sufficient. Therefore, Zugcic, Zimnicki and Grace are entitled to dismissal of the constitutional claims against them, both in their

---

[4]Defendants have not made the same argument with respect to defendants Strauss, Redman and Redwine. Defendants have, however, argued that none of the defendants, except Zugcic, were decision-makers in the decision to fail Vamplew or in his appeals. Vamplew does not address this argument in his response other than with respect to Redman. He argues, without citation to authority, that she is individually liable as the "educational leader" and Dean because the policy in place at the time led to his alleged deprivation of rights. This is not sufficient. All of the defendants, except Zugcic, are entitled to dismissal of Vamplew's individual capacity § 1983 claims on this grounds as well.

official and individual capacities.

## B. State Constitutional Claims - Money Damages

Defendants correctly note that there is no direct cause of action for money damages for a due process or equal protection violation under Michigan's State Constitution.  Such a claim requires an "enabling" statute, such as section 1983 as applied to the federal constitution.  The Michigan Legislature has not enacted such an enabling statute.  Lewis v. State of Michigan, 464 Mich. 781, 787 (2001)("[W]e should defer to the Legislature the question whether to create a damages remedy for violation of a plaintiff's rights to due process or equal protection." (citing Smith v. Dept. of Public Health, 428 Mich. 540 (1987), footnote omitted).  All defendants are entitled to dismissal of Counts IX and X to the extent Vamplew is seeking money damages.

## C. The Merits of Vamplew's Due Process and Equal Protection Claims

Even assuming Vamplew is entitled to bring a due process and equal protection claim against any of the defendants via section 1983 or Michigan's constitution, he still cannot prevail.[5]  Because Michigan law is consistent with federal law with respect to due process, Vamplew's state and federal due process claims (Counts VII and IX respectively) can be analyzed together.  See, e.g., People v. Sierb, 456 Mich. 519 (1998); English v. BCBSM, 263 Mich. App. 449, 459 (2004).

---

[5]For instance, Vamplew seeks injunctive relief as noted above.  Claims for prospective injunctive relief are not barred by the Eleventh Amendment.  To proceed, however, such claims "must seek prospective relief to end a continuing violation of federal law." McDonald v. Vill. of Northport, Mich., 164 F.3d 964, 970–72 (6th Cir. 1999). Because, as will be explained, Vamplew's claims fail on the merits, he is not entitled to any relief, monetary or injunctive.

1.  Due Process

Vamplew does not distinguish between procedural and substantive due process claims.  Defendants addressed both, as does the Court.

a.  Substantive Due Process

Substantive due process rights are those "fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition'." Washington v. Glucksberg, 521 U.S. 702, 720-721 (1997) (citation omitted).  Substantive due process only applies to those interests protected by specific constitutional guarantees or recognized as so thoroughly rooted in our traditions and conscience as to be fundamental and implicitly protected by the Constitution.  Bell v. Ohio State Univ., 351 F.3d 240, 249-250 (6th Cir. 2003).  Interests protected by substantive due process are much narrower than those protected by procedural due process.  Id.  Examples of such fundamental interests include the right to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, and to bodily integrity. Id. at 250 n. 1 (citations omitted).  Continuing a nursing school education is not a fundamental property right or liberty interest.  Indeed, courts have held that the ability to attend public high school is not recognized as a fundamental right protected by substantive due process.  See Seal v. Morgan, 229 F.3d 567, 575 (6th Cir. 2000).  Michigan courts have found the same.  See East Jackson Public Sch. v. State of Mich., 133 Mich. App 132, 137-138 (1984)("Education is not a fundamental right under Michigan's Constitution of 1963"); Palmer v. Bloomfield

21

Hills Bd. of Educ., 164 Mich. App. 573, 577 (1988) (same).  Because Vamplew does not have a fundamental right to a public college education, his dismissal from the College of Nursing does not implicate substantive due process.

Even assuming that the due process clause applied, substantive due process is violated only if the conduct at issue was "unreasonable and arbitrary" or "shocks the conscience."  Harris v. City of Akron, 20 F.3d 1396, 05 (6th Cir. 1994). The U.S. Supreme Court has stated that "[w]hen judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment."  Regents of the Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985).  The Sixth Circuit has noted that in an academic context, "judicial intervention in any form should be taken only with the greatest reluctance."  Doherty v. Southern College of Optometry, 862 F.2d 570, 576 (6th Cir. 1988), citing Ewing, 474 U.S. at 226. In Ewing, the Supreme Court cautioned that a reviewing court may not overturn a university's academic decision "unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment."  Id.  "University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation."  Id. at 225 n 11.  See also Ku v. State of Tennessee, 322 F 3d 431, 438 (6th Cir. 2003).

In light of the "narrow avenue for judicial review" in this area, Ewing, 474 U.S. at 227, summary judgment is appropriate because there is no genuine issue of material fact regarding whether the decision to dismiss Vamplew from the nursing program was

a substantial departure from accepted academic norms such that defendants did not exercise professional judgment.  Here, whether Vamplew or the Court agrees with Zugcic's conclusion, upheld on appeal, that Vamplew had engaged in an unsafe patient practice is not the focus.  Rather, the issue is whether Zugcic, in reaching that conclusion and making that decision, was exercising her professional academic and clinical judgment and whether that exercise constituted a substantial departure from accepted academic norms.  The record fails to establish such a showing.  Vamplew admits that he made mistakes regarding Patient G and used poor judgment.  He admits that at the time he accompanied Patient G to the practice vehicle he did not have the training, skills, knowledge or experience to himself assist a patient in entering or exiting a car.  While the Court may find Zugcic's decision harsh under the circumstances, the cannot conclude, nor could a reasonable juror find, that her decision to dismiss Vamplew from the nursing program was a substantial departure from accepted academic norms as to demonstrate that she failed to exercise professional judgment.  Her decision is the type of academic, clinical assessment for which courts typically, and appropriately, defer to academics, particularly in the health care field and particularly in the clinical setting.

Vamplew makes much of certain discrepancies in the record with respect to information supplied by Zugcic.  None of the discrepancies display a genuine issue of material fact as to whether he was denied his substantive due process rights.  For example, Vamplew says that Zugcic "lied" in the documentation she submitted during the appeal process, which therefore tainted the process to the point of denying him due

process.  Zugcic stated in her report which was submitted as part of the appeal that Patient G was on IV morphine and was on "hip precautions."  While it turned out that Patient G was given oral morphine and was not on "hip precautions," it does not mean that Zugcic lied or otherwise taint the process.  Zugcic testified that she was told by a RIM employee(s) (either the physical therapist McSween or the Nursing Supervisor Karen Smith that the patient was on IV morphine and had hip precautions, therefore she did not report anything she knew to be untrue.  More importantly, it is undisputed that Patient G was on morphine the day of the incident.  Whether it was oral morphine or IV morphine is not relevant for purposes of considering the unsafe nature of what occurred.  Whether Patient G was on IV morphine or oral morphine did not make a difference in Vamplew's actions.

Likewise, even if not on "hip precautions," Patient G was using a wheelchair, had a full leg "knee immobilizer" and was on non-weight bearing status post surgery for a leg fracture at the time of the incident.  Nothing about any difference between "hip precautions" and non-weight bearing restrictions coupled with use of a knee immobilize and wheelchair made Vamplew's actions less of a patient safety issue.  Zugcic's testimony that even if the patient was not on IV morphine and did not have hip precautions she would have come to the same conclusion is undisputed.

Finally, Zugcic stated in her report that when Vamplew called McSween after the incident, McSween said she felt threatened.  While McSween testified at deposition that she did not feel threatened during Vamplew's phone call, she did testify that Vamplew was "very confrontational" on the phone and that he "badgered" her.  She also testified

24

she did not tell him her work hours when he asked for them because she was concerned about him knowing her coming and going. The fact that Zugcic interpreted McSween's feelings as being threatened when McSween testified otherwise is not relevant. Moreover, Zugcic's decision to remove Vamplew was not based on his conversation with McSween.

Vamplew focuses on Patient G's medical condition and whether the patient was actually injured as a result of his actions. This misses the point. Zugcic never maintained that Vamplew's failure was the result of the patient having been injured. Patient G did not appear to have been injured. However, Zugcic concluded that what Vamplew had done was an unsafe patient practice. It is the nature of the practice in which Vamplew engaged that is at issue, not Patient G's condition or whether or not he was injured.

On the record, the Court cannot conclude that Zugcic's professional, clinical judgment was so far outside academic norms as to constitute a violation of Vamplew's substantive due process rights.

b.  Procedural Due Process

To prevail on a claim for violation of procedural due process, Vamplew must first establish the existence of a constitutionally protected life, liberty or property interest. McGee v. Schoolcraft Community College, 167 F. App'x 429, 437 (6th Cir. 2006). Vamplew must then show 1) that he was deprived of such interest; and 2) that the deprivation occurred without adequate due process. Picozzi v. Sandalow, 623 F. Supp. 1571, 1576 (E.D. Mich. 1986). The Sixth Circuit has not decided whether continued

25

enrollment in a postsecondary program is constitutionally protected for purposes of procedural due process purposes.  McGee v. Schoolcraft Comm. College, 167 F. App'x. 429 (6th Cir. Jan. 18, 2006).  The Court, following the Supreme Court's approach, assumes without deciding that Vamplew has a property interest.  See Board of Curators of Univ. of  Board of Curators of Univ. of Mo v. Horowitz, 435 U.S. 78, 84–85 (1978).  See also Bell v. Ohio State University, 351 F 3d 240, 249 (6th Cir. 2003).  The Supreme Court has held that in an academic setting, all that is required was an "informal give and take" between the student and the university.  Horowitz, 435 U.S. at 85–86.  The Supreme Court has also noted that in assessing procedural due process claims, there exists a "significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct.  This difference calls for far less stringent procedural requirements in the case of an academic dismissal."  Id. at 86.  Further, when a student is dismissed for academic, rather than disciplinary concerns, the student is not entitled to a hearing.  Id. at 89.  The Supreme Court has also explained that this is because the decision to dismiss a student for academic concerns is based upon the academic judgment of school officials and because such a decision is subjective and evaluative by nature, and therefore, "is not readily adapted to the procedural tools of judicial or administrative decisionmaking."  Id. at 90.  "As such, in the procedural due process context, informal review and evaluation sessions between student and faculty meet constitutional requirements." Borrell v. Bloomsburg Univ, 955 F. Supp. 2d 390, 403 (M.D. Pa. 2013) (quotation omitted).  In Horowitz, 435 U.S. at 85, the Supreme Court held that where medical school faculty members had informal discussions with the student regarding her shortcomings in clinical programs, and where

26

the decision to dismiss the student was "careful and deliberate," the student was afforded sufficient procedures under the Fourteenth Amendment. "[N]o more formal process is required for academic dismissals or suspensions than that the student is made aware of the faculty's dissatisfaction with his or her progress and the final decision was careful and deliberate." Ku v. State of Tennessee, 322 F.3d 431, 437 (6th Cir. 2003).

Here, Vamplew was dismissed for academic reasons—his failure to adhere to safety procedures in a clinical setting.  Therefore, he was not entitled to a full hearing before dismissal; instead, he was only entitled to an informal review with faculty members.  See id. at 85–86, 89–90; Borrell, 955 F. Supp. 2d at 403.  On this record, the procedures afforded to Vamplew were sufficient to provide him with the level of process he was due.  Vamplew was made aware of the faculty member's dissatisfaction. Immediately upon learning from the RIM physical therapist what had occurred, Zugcic called Vamplew for a meeting with herself and McSween.  Zugcic explained that the situation was serious and that he should write a report of what had occurred.

Zugcic testified that she came to her decision after due consideration and after hearing from Vamplew.  She met with him on April 12 and he submitted a written statement.  She met with Vamplew again on April 17 to inform him of the decision, where he again had the opportunity to respond.  While the Court may disagree with Zugcic's decision, it cannot conclude, nor could a reasonable juror find, that her decision was not careful or deliberate such as to deny Vamplew due process.

Moreover, although procedural due process does not mandate an internal appeal

procedure, Vamplew was provided an internal appeal procedure of which Vamplew availed himself.  His dismissal was reviewed within the College of Nursing and then in the Office of the Provost.

Vamplew points to what he says were flaws in the process in an effort to claim that he was denied due process.  For example, he was originally told by defendants Grace and Redwine, from the College of Nursing Office of Student Affairs, that there was no appeal from a failure for unsafe patient practice.  Even were such a statement made, it is still insufficient to show a lack of due process.  Vamplew did appeal.  Nor was he denied due process because he was "banned" from the DMC and RIM by Zugcic.  Defendants do not dispute that on April 12, following their meeting, Zugcic sent Vamplew an e-mail telling him to have no further contact with DMC or RIM.  However, notwithstanding that e-mail, it is undisputed that in the subsequent April 17 "failure" meeting, Zugcic told Vamplew multiple times that she had not banned him, did not have the authority to ban him, and that it was up to him to decide whether or not he wanted to go to DMC or to RIM.

Lastly, to the extent Vamplew argues that the "cease and desist" letter he received from the Dean of Students David Strauss shows that he was denied procedural due process, he cannot prevail.  The "cease and desist" letter followed a separate incident at the Provost's Office.  The cease and desist letter was not an academic decision and did not supplant the appeal process.

In the end, as defendants put it:

Assuming for purposes of this motion plaintiff's version of facts, he may be able

28

to show some flaws in the process.  Defendants are not claiming that the process was perfect, but a perfect process or the process plaintiff might have preferred is not required.  The procedural due process that plaintiff received was sufficient to pass muster, and his due process claims, both federal and state, should be dismissed.

### 2.  Equal Protection Claim

"The Equal Protection Clause does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."  Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).  In essence, a state must "treat similarly situated individuals in a similar manner."  Buchanan v. City of Bolivar, 99 F.3d 1352, 1360 (6th Cir. 1996) (internal quotation marks omitted).  Because the state and federal Equal Protection Clauses are coextensive they may be analyzed together.  See Harvey v. Michigan, 469 Mich. 1, 6 (2003); Doe v. Dep't of Social Servs., 439 Mich. 650, 670-674 (1992).

Persons with disabilities are not a suspect class for purposes of an equal protection challenge.  See Tennessee v. Lane, 541 U.S. 509, 522 (2004) (explaining that "classifications based on disability violate [the Equal Protection Clause] if they lack a rational relationship to a legitimate governmental purpose").  Moreover, the right to education is not considered a fundamental right.  See, San Antonio Independent School District v. Rodriguez, 411 U.S. 1, 33-34 (1973).

Because this case does not involve a suspect class or a fundamental right, a "rational basis" analysis is necessary.  Under this analysis, Vamplew must demonstrate that he was "intentionally treat[ed]… differently from others similarly situated without any

29

rational basis for the difference."  Radvansky v. City

of Olmsted Falls, 395 F.3d 291, 312 (6th Cir. 2005).  A governmental action is a

violation of equal protection only when it "is so unrelated to the achievement of any

combination of legitimate purposes that the court can only conclude that the

government's actions were irrational."  Warren v. City of Athens, 411 F.3d 697, 710 (6th

Cir. 2005).

        Here, defendants contend the Vamplew cannot meet his burden.  The Court

agrees.  He has not shown that he was treated differently from similarly situated but

non-disabled students.  To be considered "similarly situated" "all of the relevant aspects"

of the students to whom Vamplew compares himself must be "nearly identical." Mitchell

v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992).  This means that Vamplew must

show that there were other students, for whom Zugcic was the clinical instructor, who

engaged in comparable actions but were treated differently.

        Vamplew says that there were students who made "medication errors" but were

not failed.  However, the record does not show what these individuals students actually

did or did not do, nor is there any information as to what Zugcic knew about these

situations or whether she was the decision maker.  Moreover, in one of his written

appeal statements, Vamplew said that there were three such students.  However, at

deposition, he stated that he did not think there were three, but rather two that he

claimed fell into this group.  In any event, Vamplew did not commit a "medication error."

So regardless of how many students there were, they are not similarly situated to

Vamplew.

Vamplew also says it is policy that a warning is required before he was removed. While it is true that the course syllabus contains a section regarding managing an unsafe student in a clinical setting which discusses giving a warning as step that can be taken, it is by no means evidence of Wayne State's policy. Indeed. Zugcic testified that such steps can be taken if the situation is manageable. In her judgment, it was not. Moreover, the Student Handbook states that "a student may be excluded from the College of Nursing for unsafe practice and/or unethical behavior without having been previously warned." A course syllabus cannot supercede the handbook. To the extent that Vamplew says Wayne State violated a policy, that is in the nature of a breach of contract claim which he dismissed; it does not relate to an equal protection claim.

Vamplew also points to information he obtained from other nursing programs regarding whether a student was dismissed from a program with or without a warning for engaging in an unsafe practice. Such information is irrelevant. To show an equal protection violation, Vamplew must point to a similarly situated individual within Wayne State's College of Nursing and supervised by Zugcic who was treated differently than him for engaging in similar behavior. He has not done so. Finally, Vamplew has not shown that the treatment he received, whether different or not, was so unrelated to a legitimate purpose at to be considered "irrational

### D.  Disability Retaliation Claims

Counts IV, V and VI allege disability retaliation claims under the Americans With Disabilities Act, ("ADA"); Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), and Michigan's Persons With Disabilities Act, M.C.L. § 37.1102(1).  Courts address the

three statutes together. Andrews v. Ohio, 104 F.3d 803, 807 (6th Cir. 1997); Aho v. Dep't of Corrections, 263Mich. App. 281, 288-289 (2004). Defendants contend that Vamplew's disability retaliation claims fail on the merits.

In order to make out a claim for disability retaliation, Vamplew must show that (1) he engaged in an activity protected; (2) that defendants knew of this exercise of his protected rights; (3) that defendants consequently took an employment action adverse him; and (4) that there is a causal connection between the protected activity and the adverse retaliatory action. Steward v. New Chrysler, 415 Fed. Appx. 632, 643–44 (6th Cir. Feb.4, 2011); Blizzard v. Marion Tech. College, 698 F.3d 275, 288 (6th Cir. 2012). Once a prima facie retaliation claim is established, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for its action. Spengler v. Worthington Cylinders, 615 F.3d 481, 492 (6th Cir.2 010). The burden then shifts back to Vamplew to show the stated reasons were mere pretext to mask retaliation. Id.

Vamplew makes no attempt to discuss the elements of a retaliation claim or explain how he has met his summary judgment burden in establishing a prima facie case and pretext. Rather, he simply says that Zugcic knew he had made a prior complaint about his disability prior to the incident at RIM and him being removed from the program and that there is no evidence that any student was ever failed for engaging in one instance of unsafe behavior.

Defendants contend that even if Vamplew made out a prima facie case, the record shows a non-retaliatory basis for Zugcic's decision–the unsafe patient practice-- and there is no evidence that the reason was a prextext for discrimination based on

Vamplew's ADHD disability.

Vamplew has not made out a disability retaliation claim.  Even assuming he has articulated a prima facie case, which is not at all clear from the record, there was a legitimate reason for him being removed from the program.  That is, Zugcic's judgment that Vamplew engaged in an unsafe medical practice that warranted him failing the clinical portion of NUR 3020.  There is no evidence that Zugcic's decision had anything to do with or was motivated by any actions Vamplew may have taken related to his disability.  Rather, her decision, which was affirmed during the appeals process, was always and only based on her finding that Vamplew engaged in an unsafe practice. There is also no evidence that Zugcic's decision was a pretext to retaliate against Vamplew based on his actions related to a disability.

## E.  In Sum

Vamplew's continued focus on "no defendant has testified that they ever failed a student for 1 instance of unsafe behavior" misses the mark.  It is not what other students may have done that is relevant.  What is relevant is what Vamplew did and what Zugcic believed was the appropriate course of action.  As explained above, any inaccuracies do not amount to a denial of due process.  Zugcic's decision was made for academic reasons and was the result of careful consideration.  Whether the Court agrees with the decision is not relevant to whether Vamplew was deprived of his due process rights.  Given the narrow avenue for judicial review and in light of the totality of the record, Vamplew had failed to establish a genuine issue of material fact to support his claims regarding his dismissal from the nursing program.  There is also no indication

that the decision was made in retaliation for any actions related to Vamplew's disability.

Defendants' motion is GRANTED.  This case is DISMISSED.

      SO ORDERED.


      S/Avern Cohn                 
      AVERN COHN
      UNITED STATES DISTRICT JUDGE


Dated:  July 23, 2014
      Detroit, Michigan


I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, July 23, 2014, by electronic and/or ordinary mail.


      S/Sakne Chami            
      Case Manager, (313) 234-5160